IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS 19 BURNS AVE #1 CONCORD, NEW HAMPSHIRE, 2017 TAN JEEP RENEGADE NH REGISTRATION #4751326 DESCRIBED FULLY IN ATTACHMENT A, AND THE PERSON OF SCOTT WILKINSON** | Case No. 22-mj-_232-01-AJ_____<br><br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Tarah Snee, a Special Agent with the Federal Bureau of Investigation ("FBI"),

being duly sworn, depose and state as follows:

1.      I have been employed as an FBI Special Agent since 2015, and am currently

assigned to the Boston Field Office, Bedford Resident Agency.  I am a federal law enforcement

officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and

I am authorized by the Attorney General to request a search warrant. While employed by the

FBI, I have investigated federal criminal violations related to high technology or cyber-crime,

child exploitation, and child pornography.  I have received training in the area of child

pornography and child exploitation and have had the opportunity to observe and review

numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media,

including computer media.

2.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises located at **19 Burns Ave #1**

**Concord, NH** (hereafter "SUBJECT PREMISES"), a tan 2017 Jeep Renegade bearing New

Hampshire Registration 4751326 (hereafter "SUBJECT VEHICLE"), the person of SCOTT

WILKINSON, and any computer, computer media, and electronic media located therein, for the

things described in Attachment B – specifically, evidence, fruits, and instrumentalities of

violations of Title 18, United States Code, Section 2252(a)(4)(B), which relates to the illegal

possession of child pornography and Title 18 United States Code Section 2423(b), which relates

to travel with intent to engage in illicit sexual conduct.

     3.     During the course of this investigation, I have conferred with other investigators

who have conducted numerous investigations and executed numerous search and arrest warrants

which involved child exploitation and/or child pornography offenses.  This affidavit is intended

to show only that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter. The facts set forth in this affidavit are based in part

on my personal knowledge, information obtained during my participation in this investigation,

information from others, including law enforcement officers, my review of documents and

computer records related to this investigation, and information gained through my training and

experience.

## STATUTORY AUTHORITY

     4.     This investigation concerns alleged violations of 18 U.S.C. § 2252(a)(4)(B related

to the possession of child pornography in the District of New Hampshire.  18 U.S.C. §

2252(a)(4)(B) makes it a crime for any person to knowingly possess one or more images

depicting a minor under the age of 18 engaged in sexually explicit conduct.  18 U.S.C. § 2423(b)

makes it a crime for any person to travel in interstate commerce with a motivating purpose of

engaging in illicit sexual conduct with another person.  "Illicit sexual conduct" includes a sexual

act (as defined in section 2246) with a person under 18 years of age that would be in violation of

chapter 109A if the sexual act occurred in the special maritime or territorial jurisdiction of the

United States.  18 U.S.C. § 2423(f).  "Illicit sexual conduct" also includes the production of child

pornography.  *Id.*

## **DEFINITIONS**

5.      "Chat" refers to any kind of communication over the Internet that offers a real-time

transmission of text messages from sender to receiver.  Chat messages are generally short in order

to enable other participants to respond quickly and in a format that resembles an oral conversation.

This feature distinguishes chatting from other text-based online communications such as Internet

forums and email.

6.      "Child pornography" includes any visual depiction, including any photograph,

film, video, picture, or computer or computer-generated image or picture, whether made or

produced by electronic, mechanical, or other means, of sexually explicit conduct where (A) the

production of the visual depiction involved the use of a minor engaged in sexually explicit

conduct; (B) the visual depiction was a digital image, computer image, or computer-generated

image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct;

or (C) the visual depiction has been created, adapted, or modified to appear that an identifiable

minor is engaged in sexually explicit conduct.  18 U.S.C. § 2256(8).

7.      "Child Erotica," as used herein, means materials or items that are sexually arousing

to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene

or that do not necessarily depict minors in sexually explicit conduct.

8.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an

electronic, magnetic, optical, electrochemical, or other high speed data processing device

performing logical or storage functions, and includes any data storage facility or communications

facility directly related to or operating in conjunction with such device." These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, mobile "smart" telephones, tablets, and self-contained "laptop" or "notebook" computers).

9.      "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

10.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

11.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer

software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

12.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

13.     "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

14.     The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

15.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a

range of options in providing access to the Internet including telephone based dial-up, broadband

based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite

based subscription.  ISPs typically charge a fee based upon the type of connection and volume of

data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an

account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal

password selected by the subscriber.  By using a computer equipped with a modem, the subscriber

can establish communication with an Internet Service Provider ("ISP") over a telephone line,

through a cable system or via satellite, and can access the Internet by using his or her account name

and personal password.

16.     "Internet Protocol address" or "IP address" refers to a unique number used by a

computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a

different unique number to a computer every time it accesses the Internet.  IP addresses might also

be "static," if an ISP assigns a user's computer a particular IP address which is used each time the

computer accesses the Internet.  IP addresses are also used by computer servers, including web

servers, to communicate with other computers.

17.     "URL" is an abbreviation for Uniform Resource Locator and is another name for a

web address.   URLs are made of letters, numbers, and other symbols in a standard form.   People

use them on computers by clicking a pre-prepared link or typing or copying and pasting one into

a web browser to make the computer fetch and show some specific resource (usually a web page)

from another computer (web server) on the Internet.

18.     "Minor" means any person under the age of eighteen years.  See 18 U.S.C. §

2256(1).

19.     The terms "records," "documents," and "materials," as used herein, include all

information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

20.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.  See 18 U.S.C. § 2256(2).

21.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

**<u>PROBABLE CAUSE</u>**

22.     On July 15, 2022, Egg Harbor Township Police Department responded to 203 Heathercroft Condos, Egg Harbor Township., NJ, for a report of an individual having sexual intercourse with a 13-year-old juvenile ("Victim 1"). Victim 1's parent consented to a forensic examination of the cellular telephone used by Victim 1, an Apple iPhone 13 (IMEI: 35 681560583203 0).  During examination of the device, law enforcement officers observed a video

taken by an individual having sexual intercourse with Victim 1. The video appeared to have been filmed inside the back seat of a vehicle with a black interior. A rear door speaker with a distinctive design was visible in the video.  New Jersey investigators determined that the speaker depicted was consistent with those depicted in a stock photograph of 2017 Jeep Renegade. The individual filming appeared to be a white male inserting his penis into Victim1's vagina. Victim 1 is lying on her back in the backseat of the vehicle; the vehicle's interior is black. The video is being taken by the male, as he records himself removing his penis and ejaculating on Victim 1's stomach and rubbing his semen on Victim 1's stomach and breasts. The individual was wearing a distinctive chain link silver bracelet on his left wrist that can be seen in the video. The male can be heard saying "I can't believe I'm really fucking you" during intercourse. Also observed in the video are the car's speaker system in the back passenger seat.

23.     A photo of Victim 1 was recovered from Victim 1's cell phone and appeared to have been taken in the same vehicle as described above. Victim 1 is kneeling on the back seat facing away from the camera, her pants and underwear are off, but the Victim is wearing a black T-Shirt. There are multiple right handprints on her left buttocks. In the background of the picture the same distinct vehicle speaker system can be seen.

24.     The parent of Victim 1 agreed to allow detectives to interview Victim 1.  During the interview, Victim 1 stated in part that she met an individual named "Scott" on the social media application Omegle. Victim 1 and "Scott" exchanged Snapchat usernames to communicate. Victim 1 identified "S_Wilkinson2488" as the male from Omegle. Victim 1 stated "Scott" was a tow truck driver that lived approximately 7 hours north of New Jersey.

25.     Pursuant to a Communications Data Warrant to Snapchat for username

"S_Wilkinson2488", Snapchat provided the following subscriber information associated

S_Wilkinson2488:

    a.   Email address: berespectful2023@gmail.com

    b.   Phone number: (603) 680-1478

    c.   Old username: S_Wilkinson2488

    d.   New Username: colorado4160

26.     Pursuant to a subpoena served to Google, Inc for subscriber information for email

address: berespectful2023@gmail.com, Google provided the following information:

    a.   Name: Scott Wilkinson

    b.   Recovery SMS: 603-680-1478

27.     Open source searches for the target telephone number (603) 680-1478 revealed

the following:

    a.   User: SCOTT A. WILKINSON

    b.   Date of Birth: ████████

    c.    Social Security Number: ████████

    d.   Address: 19 Burns Avenue, Unit 1, Concord, New Hampshire 03301

    e.   Email address: berespectful84@gmail.com

    f.   Phone provider: US Cellular

28.     A query of New Hampshire motor vehicle records showed that a New Hampshire

driver's license was issued to SCOTT WILKINSON, with a date of birth of ████████,

and who resides at 19 Burns Ave. Unit 1, Concord, New Hampshire 03301. A query of vehicles

registered to Scott Wilkinson revealed:

    a.      2017 Jeep Renegade

    b.      NH Registration: 4751326

    c.      VIN: ZACCJBCB2HPF04381

29.    Law Enforcement queries of SCOTT WILKINSON's Facebook page showed him wearing a distinctive bracelet on his left wrist that appears to be the bracelet seen in the video described above.   The Facebook photograph and a close-up of the bracelet are depicted below:





30. Pursuant to a Communications Data Warrant for US Cellular for telephone number

(603) 680-1478, US Cellular provided call detail records and cell site information.

a.      Customer Name: Scott Wilkinson

b.      Customer DOB: ████████████

c.      A review of cell site data and engineering data by a Federal Law Enforcement

officer showed that the mobile telephone that is assigned call number (603) 680-1478 appeared

to leave New Hampshire at approximately 5:31 a.m. on April 9, 2022, and was in roaming status,

hitting off several cell phone carrier towers between New Hampshire and New Jersey. At

approximately 11:14 a.m., the target telephone hit off a cell phone tower in Victim 1's

hometown, Egg Harbor Township, NJ, and continued to hit off that tower until 6:25pm. On April

10, 2022, at approximately 12:18 AM the target telephone hit off a cellular tower in New

Hampshire.

d.      Upon review of engineering data from US Cellular, the target device bearing call

number 603-680-1478 utilizes towers consistent with the phone being at or near 19 Burns Ave.

Concord, New Hampshire on a regular basis.

e.      On November 10, 2022, a request was made to US Cellular for subscriber

information for the mobile phone number (603) 680-1478.  US Cellular provided the following

subscriber information: Contact Names: Cassandra Wilkinson (Authorized) and Scott Wilkinson (Primary), Billing address 19 Burns Ave #1 Concord, NH, Customer Creation Date 09/22/2018.

31.     On November 9, 2022, Federal Law enforcement officers submitted SCOTT WILKINSON's biographical information, social media accounts, telephone number and email addresses to the National Center for Missing and Endangered Children (NCMEC).  NCMEC sent a CyperTip to law enforcement officers relating to child sexual explicit material (CSEM) uploaded and stored on a Google Drive infrastructure. The information was also sent to the New Hampshire ICAC.  On November 9, 2022, the New Hampshire ICAC made the information available to the FBI Boston – Bedford RA.

32.   The NCMEC report showed that Google flagged 14 MP4 files for CSEM. According to the NCMEC report, "[a] person at Google viewed the file to the extent necessary to confirm that it contained apparent child pornography concurrently to or immediately preceding the sending of the cyber tip."  These videos were uploaded and stored in a Google Drive infrastructure at various times on October 10, 2022.  The MP4 files range from 23 seconds to seven minute and seven seconds.  On 11/10/2022 SA Snee reviewed the MP4 files and determined that all 14 videos depicted CSEM. Several of these MP4 files depicted prepubescent minor females engaging in sexually explicit conduct with adult males.  Google reported that the subscriber information associated with the Google Drive that the files were uploaded to is: Name: Scott Wilkinson, Mobile Phone (603) 680-1478, Email address: berespectful2023@gmail.com. The IP address used to upload the files was 2601:18c:8200:8300:630f:8dc2:79ca:6e5e, which comes back to Comcast.

33.     On November 10, 2022, SA Snee called Comcast and made a request for subscriber information for the IP address 2601:18c:8200:8300:630f:8dc2:79ca:6e5e on the above mentioned dates and times.  SA Snee provided a Comcast representative with an overview of the information listed above with respect to the New Jersey based investigation and the investigation of the CSEM material uploaded to a Google drive.  The Comcast representative made an independent determination that the totality of the circumstances establish exigent circumstances that warranted providing the requested information without the need for legal process.  The Comcast representative verbally confirmed that on October 10, 2022, IP address 2601:18c:8200:8300:630f:8dc2:79ca:6e5e was assigned to the following subscriber: First name: Scott, Last name: Wilkinson, Address: 19 Burns Ave #1 Concord, NH 03301.

## COMPUTERS, ELECTRONIC STORAGE
## AND FORENSIC ANALYSIS

34.     As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and search of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

35.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

        a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

e.      Your Affiant is also aware, through training and experience, that digital storage devices have become interconnected, making it easy for even casual users of technology to transfer or copy images from one device to another, or to maintain duplicate copies on more than one device or storage medium.   In fact, many devices such as smartphones can be set to

14

automatically back up their contents to alternate storage facilities, such as laptop or desktop computers, another phone, photo-sharing websites, and cloud storage providers.

    f. Your Affiant is aware that the contents of smart phones can be synched with or backed up to other digital devices in a variety of ways.  Smartphones can be connected through cables to other devices, such as laptop computers, for data transfer.  Smartphones can also connect to other devices and transfer photos or documents wirelessly through technology such as Bluetooth.  Data can also be sent from the phone to an email account via the Internet, and subsequently downloaded from the Internet to a different device (such as a tablet, game system, or computer) for storage. In addition, many smartphones utilize "cloud" storage.  Cellular telephones can be set to automatically back up their contents to user accounts hosted on servers of various cloud storage providers. Users can also opt to perform a back-up manually, on an as-needed basis. Your Affiant is aware that some smartphones also back up their contents automatically to devices such as laptop computers.  Additionally, cellular telephones can exchange data between two differing cellular communications devices and other types of electronic and media storage devices via Bluetooth or Wi-Fi, regardless of the type of operating system or platform being utilized to operate each of the electronic devices. In addition, media cards which contain many forms of data can be interchanged between multiple types of electronic devices, including but not limited to, different cellular telephones.

    36. As set forth above, probable cause exists to believe that an individual at the SUBJECT PREMISES has received or possessed child pornography. Based upon my knowledge and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

a.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals often times use these materials for their own sexual arousal and gratification.

b.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals often retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

c.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

d.      Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

37.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38.     Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable.  This includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones.  In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles, and/or on their person.

39.     Searching storage media for the evidence described in the attachment may require a range of data analysis techniques. In most cases, a thorough search for information stored in

storage media often requires agents to seize most or all electronic storage media and later review the media consistent with the warrant. In lieu of seizure, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     **The nature of evidence**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

b.     **The volume of evidence**. Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching

authorities to peruse all the stored data to determine which particular files is evidence or instrumentalities of a crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

        c.     **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        d.     **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

40.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the hardware, media, or peripherals on-site, the warrant I am applying for would permit officers either to seize or to image-copy those items that reasonably appear to contain some or all of the evidence described in the warrant, and then later review the seized items or image copies consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

41.     This warrant seeks authorization for law enforcement to compel the SCOTT WILKINSON to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. Grounds for this request follow.

42.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

43.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

44.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front- facing camera then

21

analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

45.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

46.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

47.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the

DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

48.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

49.     In light of the foregoing, and with respect to any device found in/on the SUBJECT PREMISES or the SUBJECT VEHICLE, law enforcement personnel seek authorization, during execution of this search warrant, to: (1) press or swipe the fingers (including thumbs) of SCOTT WILKINSON to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of SCOTT WILKINSON and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of SCOTT WILKINSON and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

50.     The proposed warrant does not authorize law enforcement to compel that an individual present at the SUBJECT PRESMISES state or otherwise provide the password or any other means that may be used to unlock or access the DEVICES.  Moreover, the proposed warrant does not authorize law enforcement to compel an individual present at the SUBJECT PRESMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the DEVICES.

## CONCLUSION

51.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the crime of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) may be located at the SUBJECT PREMISES, in the SUBJECT VEHICLE, or on the person of SCOTT WILKINSON.  I therefore seek a warrant to search these locations, as described in Attachment A, and any computer and electronic media found therein, and to seize the items described in Attachment B.

52.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

> ___/s/ Tarah Snee_____
> Tarah Snee
> Special Agent
> Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Nov 11, 2022**

Time: **6:33 PM, Nov 11**, 2022

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched include:

1. the residential property located at 19 Burns Ave #1 Concord, New Hampshire, including associated outbuildings and garages (the SUBJECT PREMISES);

2. a tan 2017 Jeep Renegade, New Hampshire Registration 4751326 (the SUBJECT VEHICLE); and

3. the person of SCOTT WILKINSON.

The SUBJECT PREMISES is part of a multi-level apartment building with the SUBJECT PREMISES located on the end unit. The following photograph depicts the SUBJECT PREMISES.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2423(b), and 2252(a)(4)(B):

1.      All records relating to violations of 18 U.S.C. §§ 2423(b) and 2252(a)(4)(B), in any form wherever they may be stored or found at 19 Burns Ave #1 Concord, New Hampshire, including:

    a.      any and all communications or evidence of communications or contact between WILKINSON & Victim 1;

    b.      records or information related to travel between New Hampshire and New Jersey in April of 2022;

    c.      records and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256;

    d.      records or information pertaining to an interest in child pornography;

    e.      records or information pertaining to the possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    f.      records or information of and relating to visual depictions that have been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256, including the record or information used to create the visual depiction;

    g.      records or information pertaining to Omegle and/or Snapchat;

    h.      photo-editing software and records or information relating to photo-editing software;

    i.      records or information relating to the occupancy or ownership of 19 Burns Ave #1 Concord, New Hampshire, including, but not limited to, utility and telephone bills, mail envelopes, vehicle registrations, tax bills, and other correspondence.

2.      Any computer or electronic media that were or may have been used as a means to commit the offenses described on the warrant, including the possession of child pornography in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and interstate travel to engage in illicit sexual conduct in violation of Title 18, United States Code, Section 2423(b).

3.      For any computer, computer hard drive, or other physical object upon which electronic data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.      evidence of the lack of such malicious software;

    d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f.      evidence of the times the COMPUTER was used;

    g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i.      contextual information necessary to understand the evidence described in this attachment.

4.      Records and things evidencing the use of the Internet, including:

a.   routers, modems, and network equipment used to connect computers to the Internet;

b.   records of Internet Protocol addresses used;

c.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5.   A silver chain link bracelet appearing similar to the bracelet described and depicted in Paragraph 29 of this affidavit.

**6.**   DEVICE UNLOCK: During the execution of the search of the property, person(s), and vehicle(s) described in Attachment A, and with respect to any device subject to seizure pursuant to this warrant, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of SCOTT WILKINSON to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of SCOTT WILKINSON and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of SCOTT WILKINSON and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).